UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
PATRICIA GLAST,

      Plaintiff,        **MEMORANDUM & ORDER**

    – against –           11-CV-5814 (SLT)

MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,

      Defendant.
----------------------------------------------------------------x

**TOWNES, United States District Judge:**

    Plaintiff Patricia A. Glast brings this action pursuant to Section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, the Commissioner's motion is denied and the action is remanded for further proceedings in accordance with this opinion.

## I.  PROCEDURAL HISTORY

    On April 28 and 30, 2009, respectively, Plaintiff filed applications for SSDI benefits and SSI with the Social Security Administration ("SSA"), alleging that she became disabled on August 22, 2008, due to high blood pressure, diabetes, a left knee meniscal injury, and sciatica. (R. 125, 127, 158). After the SSA denied Plaintiff's applications on July 23, 2009, (R. 66-71), she requested a hearing before an administrative law judge ("ALJ"), (R. 72-73).

On March 7, 2011, ALJ Gal Lahat held a hearing where Plaintiff was represented by counsel. (R. 26-63). At the hearing, ALJ Lahat heard testimony from Plaintiff and a vocational expert. (R. 27). ALJ Lahat issued a decision on May 27, 2001, in which he concluded that Plaintiff was not disabled within the meaning of the Act. (R. 7-19). Plaintiff subsequently submitted to the Appeals Council as additional evidence an MRI and a physician report. (R. 4). On September 29, 2011, the Appeals Council denied Plaintiff's request for review, stating that it had considered the additional evidence, but that neither they nor Plaintiff's objections "provide[d] a basis for changing the [ALJ]'s decision." (R. 1-2). The Appeals Council indicated that it was making the additional evidence "part of the record." (R. 5).

Plaintiff timely commenced this action on November 30, 2011. On July 13, 2013, the Commissioner filed a fully-briefed motion for judgment on the pleadings pursuant to Rule 12(c), arguing that the Commissioner's decision must be affirmed because it is based on substantial evidence in the record and contains no errors of law. (Docket No. ("Mem.") at 1). In opposition, Plaintiff claims that the ALJ's decision "contains multiple legal and factual errors," and requests that the Court reverse the decision or remand the case for further proceedings. (Opp. at 1).

## II.    RELEVANT FACTS

### A.    Nonmedical Evidence

Plaintiff was born on June 10, 1949, (R. 32), and completed one year of college in 1968, (R. 163). From 1975 to November 2002, she worked as a word processor and work processing supervisor at various law firms, where she edited and revised legal documents. (R. 190, 196). In 2004, Plaintiff began work as an administrative aide in a charter school, where she was responsible for ordering and disbursing school supplies, answering telephone calls, typing

reports, managing files, and maintaining inventory. (R. 34-35, 193). In 2006, she obtained a position as a clerk for the transportation division of the New York City Board of Education and then for the New York City Administration for Children's Services ("ACS"). (R. 190-92). On August 22, 2008, Plaintiff slipped at a supermarket and fell on her knees. (R. 38, 127, 213, 214).[1] Plaintiff testified that her job at ACS ended because: "I couldn't do it anymore because it meant that I would have to climb up on ladders to file and I had hurt my leg at that time." (R. 35). She reported that she stopped working on December 31, 2008, when she was "laid off." (R. 158). Plaintiff was 59 years old at the time she allegedly became disabled.

B.     **Medical Evidence**

On September 3, 2008, soon after her fall, Plaintiff visited Dr. David Lifschutz, a neurologist at Integrated Neurological Associates, PLLC ("Integrated"). (R. 214-16). Dr. Lifschutz examined Plaintiff and concluded that she had "sustained multiple trauma and posttraumatic pain syndrome" which was consistent with (1) "[l]eft greater than right knee trauma with strain and sprain"; (2) "[l]umbosacral strain, sprain and myofasciitis[2] with radicular signs and symptoms"; and (3) "[c]ervical strain, sprain, and myofasciitis." (R. at 216). Dr. Lifschutz recommended physical therapy, prescribed Vicodin and Naproxen, recommended an orthopedic evaluation, and ordered an MRI of the left knee. (R. 216).

---

[1]     According to subsequent doctors' notes, Plaintiff reported visiting the emergency room the day she fell and that x-rays taken there showed no fractures. (R. 214). She also reported returning to the emergency room a few days later with severe pain and left with a prescription for Percocet. (R. 214). As the ALJ noted, there are no original documents reflecting these visits, tests, or treatment in the administrative record. (R. 15 ("Despite reports of initial emergency room treatment, the record is absent documentation of the visit.")). Additionally, some records indicate the date of Plaintiff's fall was August 26, 2008. (R. 214-18).

[2]     Myofasciitis is inflammation to the muscles that support the shoulders and neck due to either overuse or trauma in the spine region. See http://emedicine.medscape.com/article/305937-overview) (last visited Sept. 30, 2013).

3

On September 24, 2008, Dr. Richard Heiden reviewed Plaintiff's MRI of the left knee and reported joint effusion, a tear of the posterior horn medial meniscus, a tear of the posterior horn lateral meniscus, a partial tear of the posterior cruciate ligament, and a sprain of the medial collateral ligament. (R. at 219).

On October 6, 2008, Plaintiff first visited Dr. Andrew Miller, an orthopedist at Integrated. After examining Plaintiff, Dr. Miller noted that she had mild effusion, full extension, significant medial joint line tenderness, and mild lateral joint line tenderness. (R. at 213). Dr. Miller opined that Plaintiff had a torn meniscus of her left knee, that there was a "causal relationship" between the injury and the fall in the supermarket, and that she was a candidate for left knee arthroscopic surgery. (R. at 213.)

Later the same day, Plaintiff had a follow-up visit with Dr. Lifschutz and reported that physical therapy was "helpful." (R. 217). Upon examination, Plaintiff demonstrated full strength in all extremities with no dysmetria,[3] but she had a cautious gait. (R. 217). Plaintiff showed some tenderness on palpitation of her paraspinal muscles and of her left knee. (R. 217). Dr. Lifschutz noted that the orthopedist had advised surgery and then recommended that Plaintiff continue physical therapy and pain medication, as well as return for orthopedic and neurological follow-ups. (R. at 217).

On December 8, 2008, Plaintiff returned to Dr. Lifschutz, who observed that Plaintiff's gait was "normal." (R. at 218). He recommended a continuation of physical therapy and an MRI of her lumbar spine, as well as orthopedic and neurological follow-ups. (R. at 218).

On June 19, 2009, Plaintiff was examined by Dr. Jerome Caiati, an SSA consultant. (R. at 223-26). Dr. Caiati diagnosed hypertension, diabetes, pancreatitis resolved, left knee torn

---

[3] Dysmetria is a "disturbance of the power to control the range of movement in muscular action." See http://medical-dictionary.thefreedictionary.com/dysmetria (last visited Sept. 30, 2013).

4

meniscus, "lumbosacral pain with no workup for diagnosis," and right knee pain with etiology undetermined. (R. at 225-26). He assessed Plaintiff as having unrestricted sitting, reaching, pushing, and pulling; minimal limitation for standing, walking, and climbing due to left and right knee pain; moderate limitation for bending due to low back pain; and moderate limitation for lifting due to low back and right and left knee pain. (R. 226). Dr. Caiati also ordered a lumbosacral spine x-ray, conducted the same day by radiologist Dr. Lawrence Liebman, who found "[n]o acute bony abnormality." (R. at 227).

On July 14, 2009, Plaintiff presented for a psychiatric evaluation with Dr. Michael Alexander, an SSA consultant. (R. 254). Dr. Alexander wrote that Plaintiff was able to care for herself, manage her own money, take public transportation independently and drive, though getting in and out of the bathtub and performing household chores were difficult because of her medical problems. (R. 256). Plaintiff reported a history of "feeling down" since she was laid off, but attributed these symptoms to her lack of a job or medical insurance. (R. at 254). Dr. Alexander found that the results of the exam did not "appear to be consistent with any psychiatric problems, which would significantly interfere with [her] ability to function independently on a daily basis." (R. 256). On a "Psychiatric Review Technique" form dated July 23, 2009, Dr. Robert Lopez, an SSA consultant, indicated that based upon Dr. Alexander's exam, Plaintiff's allegation that she had difficulty functioning due to depression was not credible and that she was capable of following supervision, relating appropriately to coworkers, and performing substantial gainful activity. (R. 270).

On July 23, 2009, SSA medical consultant F. Osorio completed a "Physical Residual Functional Capacity Assessment ("RFC"), noting that Plaintiff suffered from a torn knee meniscus and hypertension. (R. 272). Osorio checked various boxes finding that Plaintiff could

5

occasionally lift 20 pounds, frequently lift 25 pounds, stand or walk for about six hours, sit for about six hours, and push or pull with limitations in her lower extremities. (R. 273). Osorio also checked boxes indicating that while Plaintiff could never climb stairs, she could at least occasionally balance, stoop, kneel, crouch, or crawl. (R. 274). Osorio found no manipulative, visual, communicative, or environmental limitations. (R. 274-75). Osorio ultimately concluded that Plaintiff was capable of performing her past work as a word processor. (R. 276).

On December 16, 2009, Dr. Gary Zabarsky issued a prescription for physical therapy, three times a week for eight weeks. (R. 297, 306). The record suggests that Dr. Zabarsky is a primary care physician who began seeing Plaintiff in 1985, treated her for high blood pressure and diabetes, (R. 160, 163, 185, 205), and submitted to the SSA a file that included a report, dated or received July 9, 2009, (R. 70, 71, 281, 282). Aside from his physical therapy prescription, however, the record contains no original documents from Dr. Zabarsky. As to the physical therapy he prescribed, the record indicates that Plaintiff saw Kathryn Kho during the period of December 21, 2009 to March 12, 2010, complaining of left knee pain. (R. 298-304).

On January 25, 2010, physician assistant Edward McLaughlin examined Plaintiff, who chiefly complained of left knee pain and meniscus tear. (R. 289). He observed a slightly antalgic gait, no swelling, good joint alignment, but a positive test for joint pain. (R. 290). Due to her "occasional severe pain and occasional mechanical symptoms," he recommended a new MRI scan of the left knee. (R. 290). Dr. Jeffrey Rosen, an orthopedic surgeon, also signed the report and thereafter referred Plaintiff for the MRI. (R. 290, 287).

On March 4, 2010, Plaintiff had an MRI of the left knee which was initially reviewed by Joseph F. Dorsten, D.O. (R. 287). His assessment was "joint effusion," and that "a small

incomplete intrameniscal tear for the posterior horn of the medial meniscus could not be excluded." (R. 288).

On March 22, 2010, Plaintiff returned to Dr. Rosen to review the same MRI. (R. 291-92). Plaintiff complained of significant discomfort and stated that she would like to consider surgery. (R. 291). Dr. Rosen noted significant medial joint line tenderness to palpitation on the left knee during the exam. (R. 291). He also commented that the MRI showed a "possible full-thickness tear of the posterior horn of the medial meniscus." (R. 292). Dr. Rosen discussed with Plaintiff the operative and non-operative treatment options, including arthroscopic surgery and its limitations, as well as its risks and protocols. (R. 292). Dr. Rosen noted that they would "make arrangements for surgery pending authorization [of] a medical clearance at the patient's request." (R. 292).

Plaintiff was re-evaluated by Kho, the physical therapist, on March 29, 2010. (R. 303). Plaintiff complained of pain to her left knee, as well as stiffness and tightness in her left knee joint. (R. 303). She had an analgic gate and Kho observed a limitation of motion on left knee flexion, weakness of the left leg quadriceps and hamstring, as well as decreased balance on standing due to frequent knee locking. (R. 303).

On February 18, 2011, Plaintiff met with Juliza Santiago, another physical therapist, who conducted a re-evaluation and completed an RFC Assessment. (R. 293-96). Santiago described Plaintiff's ability to sit, stand, and walk as severely limited to five-minutes during a work day. (R. 294). Santiago also indicated that Plaintiff complained of "severe bilateral knee pain," was able to walk approximately three blocks within an "unsteady, slow gait," was unable to squat, crawl, or climb, had a severe risk of falling, and could not travel alone by bus or subway. (R. 294, 296). Santiago further concluded that Plaintiff could do repetitive non-weight-bearing

7

movements in a sitting position for a short period of time. (R. 295). There appears to be another physical therapy evaluation dated February 24, 2011, but the signature and the form itself are largely illegible. (R. 304).

### C. Hearing Before the ALJ

On March 6, 2011, the day before the hearing, Plaintiff's attorney faxed a letter to the ALJ summarizing Plaintiff's work history, injuries, and symptoms, as well as the dates and nature of various medical visits. (R. 202-04, 305-07). Counsel indicated in her letter that Plaintiff was "now seeing Vladimir Osi[p]ov, M.D.," but attached no records from this treating physician. (R. 204, 307). As noted, Plaintiff and a vocational expert testified at the March 7, 2011, hearing. (R. 6, 28).

#### 1. Plaintiff's Testimony

Plaintiff testified that at the time of the hearing, she was almost 62 years old, had no children, was separated since 2002, and rented a room from an elderly lady in an apartment. (R. 32). Over the prior two years, she maintained herself on spousal support and a small pension from a law firm that had employed her until 2002. (R. 33-34). After she lost her job as an ACS file clerk, she worked briefly for the City of New York, which had a training program for the new voting machines. (R. 36). Plaintiff had to stop that work because of her knee condition. (R. 36). The ALJ pressed Plaintiff to reconcile how on the one hand she was seeking disability benefits, and on the other hand she had been certifying that she was ready, willing, and able to work so that she could collect unemployment benefits. (R. 36-37). Plaintiff explained that she was "almost destitute" and that if someone offered her a job, she would take it – but would not be able to hold it. (R. 37).

Plaintiff testified that her primary complaint was her left knee, which she injured when she fell in a grocery store. (R. 38). She described the pain as "hav[ing] a piece of steel or lead in the leg, there's burning, there's buckling, it's just a nightmare." (R. 38). She was taking Vicodin for the pain, which made her feel somewhat better "for a few hours." (R. 39). Plaintiff also stated that she began physical therapy in 2008, but had to suspend treatment because she lost insurance until she was granted Medicaid coverage. (R. 39). Although physical therapy and medication helped, she did not think she could hold down a job "for long." (R. 40). Plaintiff testified that her doctors wanted to do arthroscopic surgery, but she refused "because I was told that it would not free me of pain and eventually I'm going to [need] a knee replacement" in five years. (R. 40).

Additionally, Plaintiff stated that high blood pressure and anxiety attacks would interfere with her ability to work. (R. 41). Pressed on the issue, Plaintiff admitted that she had been hypertensive for 14 years, even when she was previously employed, (R. 41), and that this condition would not interfere with her ability to work, (R. 42). As to the anxiety attacks, Plaintiff stated that she had been having them since her fall in the supermarket. (R. 43). She testified that Dr. Zabarsky prescribed medication for the anxiety, which she discontinued in 2010. (R. 43). She testified that the episodes had returned over the past five months, but she was not being treated. (R. 43). With regard to her diabetes, Plaintiff indicated that it was controlled with medication and would not interfere with a job. (R. 44). Finally, Plaintiff testified that she had been suffering from sciatica for "[a]bout a year-and-a-half" and that Dr. Zabarsky was treating her with Vicodin. (R. 44). The sciatica affected her right leg from hip to ankle and caused pain "some of the time," regardless of her posture. (R. 44-45).

Plaintiff testified that her most recent MRI was performed in 2010, but counsel informed the ALJ that it was not in the record. (R. 45). Plaintiff attended the hearing with a cane, which she stated was prescribed in the emergency room after her fall in the grocery store. (R. 47). She testified that she was able to walk about three blocks without the cane, and then her leg would buckle, which had caused her to fall "a few times." (R. 47). She could stand for 20 to 30 minutes or sit for about 20 minutes before her leg and lower back caused too much discomfort and she would need to cry and stretch her leg. (R. 47-48). She thought she could lift and carry 10 pounds, but had trouble with stairs, climbing, bending, and stooping. (R. 48). Plaintiff said that she had to lie down on the bed or the floor to put on her clothes, and it was difficult to get into a bathtub. (R. 48). Plaintiff stated that she was unable to do household chores on a regular basis because of her limitations, that her typical day involved reading and sleeping, and that she left her apartment "[m]aybe once" a week to see her lawyer or doctor. (R. 49). Her current physician, Dr. Osipov, was just one block away, and before that, her landlady would drive her to Dr. Zabarsky. (R. 49). Plaintiff did not take public transportation because of the stairs and depended on her landlady to drive her many places. (R. 51).

With regard to her doctors, Plaintiff testified that Dr. Zabarsky, her "family doctor," had been treating her, but had developed cancer and was no longer practicing. (R. 50). She stopped seeing the specialists at Integrated in 2008 after there was a lien on her account and she could not afford to take a cab to their offices. (R. 50). Accordingly, at the time of the hearing, Plaintiff was receiving physical therapy and treating only with Dr. Osipov. (R. 51).

### 2. Vocational Expert's Testimony

Jay Steinbrenner, a vocational expert, testified at the hearing. (R. 53). The ALJ first asked Steinbrenner whether a person of Plaintiff's age, education, and work background could

perform any of her past work, assuming she could lift and carry 20 pounds occasionally, 10 pounds frequently; stand and walk for four hours out of eight; sit for six hours out of eight; and that her ability to stoop, bend, kneel, crouch and crawl was restricted to half the work day. (R. 55). Steinbrenner opined that all of Plaintiff's past work would be viable. (R. 55). The ALJ then altered the hypothetical, asking Steinbrenner to assess whether a person of Plaintiff's age, education, and work background could perform her past work, assuming she could stand, sit and walk for no more than five minutes at a time; could occasionally bend, reach, and carry up to five pounds; but could never squat, crawl, climb, work around unprotected heights, or drive a motor vehicle. (R. 56). Steinbrenner testified that the only viable past work would be as a word processing supervisor, and that "with these limitations, there probably would be an impact on the number of those jobs." (R. 56). For example, the "occasional" limitation on reaching "would probably take a good 50% of those jobs out of the market." (R. 57). Steinbrenner stated that he could not comment on whether the inability to take public transportation would have an impact. (R. 57-58). He added, however, that Plaintiff's inability to climb stairs would similarly erode the number of potential jobs "by as much as 50%" because facilities without an elevator might be problematic. (R. 58). ALJ Lahat and Steinbrenner then engaged in the following exchange:

> ALJ: Let me just clarify. So, I understood initially the occasional reaching reduced the jobs by 50%. Would the no climbing of stairs further reduce it to basically no jobs?
>
> VE: I think those two in combination probably would, and plus adding in the short duration of five minutes at a time. And lifting five pounds, though I wouldn't see a person having to lift more than that, that is less than the full range of sedentary. So, I think by that point, you've pretty much eliminated all jobs.
>
> ALJ: Including the past work?
>
> VE: Including the past work yes, Your Honor.

(R. 58-59).

### 3. Record Left Open for Additional Evidence

At the close of the hearing, ALJ Lahat asked counsel to research the issue of Plaintiff's MRIs and determine whether any other diagnostic tests were absent from the file. (R. 59). The ALJ also asked counsel about records from Dr. Osipov, whom Plaintiff said she had seen twice before the hearing. (R. 59). Counsel stated that she would ask "again" for Dr. Zabarsky's records and try to get Dr. Osipov's notes. (R. 60). The ALJ indicated that he would leave the record open until March 21, 2011, to submit any additional evidence. (R. 61).

On March 15, 2011,[4] counsel faxed a letter to ALJ Lahat, writing that she "contacted Dr. Zabarsky's former office Crystal Ray [sic] to inquire if his treatment notes were available" and "was told that Dr. Zabarsky had retired and had taken his records with him." (R. 207). Counsel asked the ALJ to render his decision "on the evidence available." (R. 207). Counsel made no comment as to records from Dr. Osipov or the emergency room.

### D. ALJ Decision

ALJ Lahat issued a decision on May 27, 2011, in which he concluded that Plaintiff was not disabled during the relevant period, which commenced on August 22, 2008. (R. 10-19). The ALJ began his opinion by outlining the "five-step sequential evaluation process" dictated by 20 C.F.R. § 404.1520(a), which is used to determine whether a claimant is disabled. Under this five-step framework, the SSA must first consider a claimant's work activity. If the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise, the SSA next considers the "medical severity" of the claimant's impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not have "any impairment or combination of impairments which significantly

---

[4] The letter's date, March 6, 2011, appears to be a typo. The fax cover sheet and the date stamp at the top of the letter reflect the correct date. (R. 206, 207).

limit [his or her] physical or mental ability to do basic work activities," the claimant does not have a severe impairment and, therefore, is not disabled. 20 C.F.R. § 404.1520(c).

In the third step, the SSA further considers the medical severity of the impairment by comparing the claimant's impairments to those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). If the claimant has an impairment or combination of impairments which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is disabled. 20 C.F.R. § 404.1520(d). If not, the SSA must proceed to the fourth step and assess the claimant's "residual functional capacity" to do his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do his or her "past relevant work," the claimant is not disabled. Id. However, even if the claimant can no longer perform the past relevant work, the claimant is not disabled if he or she "can make an adjustment to other work." 20 C .F.R. § 404.1520(a)(4)(v). The SSA bears the burden of proof only with respect to this fifth step. The claimant bears the burden with respect to the other four steps. Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).

Beginning with Step One of the five-step sequential analysis required under 20 C.F.R. § 404.1520, ALJ Lahat determined that Plaintiff had not engaged in substantial gainful activity during the relevant period. (R. 12). At Step Two, ALJ Lahat concluded that Plaintiff had a "severe combination of impairments," within the meaning of the Act, including "diabetes; hypertension; left knee impairment with torn meniscus; [and] cervical and lumbar spine impairments with diagnosis of strain/sprain." (R. 12). The ALJ determined, however, that the evidence did not support any medically-determinable severe impairment stemming from Plaintiff's cholecystectomy in March 2008 or from any mental health condition. (R. 12-13).

At Step Three, the ALJ found that Plaintiff did not "have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1." (R. 13). ALJ Lahat concluded that Plaintiff had the RFC to perform less than the full range of light work within the meaning of 20 C.F.R. § 404.1567(b) and 416.967(b) because she was "capable of lifting/carrying and pushing/pulling twenty pounds occasionally and ten pounds frequently," that she could "sit for six hours total and stand/walk for four hours total in an eight-hour work day," and that she was "limited to stooping/bending, kneeling, crouching, and crawling four hours total in an eight-hour workday." (R. 14).

In reaching these conclusions, the ALJ indicated that he considered Plaintiff's written allegations, treatment reports from Dr. Lifschutz and Dr. Miller, diagnostic studies, an SSA consultative internal medicine examination by Dr. Caiati, physical therapy evaluations and assessments, and hearing testimony from Plaintiff and the vocational expert. (R. 15). Notably absent, however, is any indication that the ALJ received or reviewed treatment records from Dr. Zabarsky or Dr. Osipov, both treating physicians. The ALJ did observe that the record contained no documentation of Plaintiff's visits to the emergency room after her accident. (R. 15).

ALJ Lahat concluded that "records show that with conservative and sustained treatment, [Plaintiff's] condition began improving" during 2008, although Dr. Miller recommended surgery. (R. 16). ALJ Lahat noted that there is no evidence of treatment for one year, until December 2009, "allegedly due to lack of insurance." (R. 16). The ALJ afforded "significant weight" to the opinion of Dr. Caiati, the SSA consultant, who noted no medications for pain and minimal clinical abnormalities, and assessed minor physical limitations. (R. 17). ALJ Lahat observed that Plaintiff had certified she was able to work to obtain unemployment benefits, though she testified she did not think she could maintain any job. (R. 17). As part of his

14

analysis, the ALJ also considered Plaintiff's testimony regarding her pain, treatment with physical therapy and Vicodin, and that she refused arthroscopic surgery after being told it would not free her of pain and she would, in any event, need a knee replacement in approximately five years. (R. 17-18). The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her allegations and testimony were not fully credible due to evidence in the record of "limited and conservative medical care," "minimal clinical findings," and "limited and routine medication usage with effective results." (R. 18).

At Step Four, ALJ Lahat determined that Plaintiff retained the RFC to perform past relevant work, including as a word processing supervisor, an administrative assistant, or a file clerk. (R. 19). The ALJ asserted that "[t]he vocational expert's testimony is supportive of this finding." (R. 19).

### E. Appeals Council and Additional Evidence

Following ALJ Lahat's decision, Plaintiff's counsel submitted to the Appeals Council a report from treating physician Dr. Osipov dated July 20, 2011, as well as an MRI dated July 14, 2011. (R. 4, 308-15). In Dr. Osipov's "Report of Claim of Disability," he opined that during an eight-hour work day, Plaintiff could sit for four hours, stand for two hours, and walk for one hour; that she could "occasionally" lift and carry only up to five pounds; that she could "never" stoop, kneel, crouch, crawl, or climb; that she could not use her feet for repetitive movements; and that she could travel by bus, but not subway. (R. 311-13).

On September 29, 2011, the Appeals Council denied Plaintiff's request for review, stating that the additional evidence and Plaintiff's objections did not provide a basis for altering the ALJ's decision. (R. 1-2).

15

## III. DISCUSSION

### A. Standard of Review

Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §405(g), permits "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, … [to] obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision … in the district court of the United States for the judicial district in which the plaintiff resides." The review is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard. 42 U.S.C. § 405(g). A district court then has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). Accordingly, before a court can determine "whether the Commissioner's conclusions are supported by substantial evidence . . . [it] must first be satisfied that the claimant has had a full hearing under the . . . Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).

### B. Duty to Develop the Record

As a general rule, an ALJ has an affirmative duty to develop the factual record. Rosa v. Callahan, 168 F.3d 72, 79-80 (2d Cir. 1999). Due to the non-adversarial nature of a Social Security hearing, "[t]he duty of the ALJ, unlike that of a judge at trial, is to 'investigate and

16

develop the facts and develop the arguments both for and against the granting of benefits.'" Vincent v. Comm'r of Social Security, 651 F.3d 299, 305 (2d Cir. 2011) (quoting Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004)).  This affirmative duty "includes the obligation to contact a claimant's treating physicians and obtain their opinions regarding the claimant's residual functional capacity." Tirado v. Astrue, No. 10-CV-2482 (ARR), 2012 WL 259914, at *4 (E.D.N.Y. Jan. 25, 2012).  Moreover, "it is the well-established rule in our circuit" that such a duty exists "[e]ven when a claimant is represented by counsel." Moran, 569 F.3d at 112; see Harris v. Colvin, No. 11-CV-1497, 2013 WL 5278718, at *8 (N.D.N.Y. Sept. 18, 2013) ("[T]his Court is compelled to conclude that the ALJ's reliance on claimant's counsel to obtain the treating physician's records was inadequate."); Newsome v. Astrue, 817 F. Supp. 2d 111, 137 (E.D.N.Y. 2011) ("The fact that the ALJ requested additional information from the Plaintiff's attorney and did not receive that information does not relieve the ALJ of his duty to fully develop the record.").  An ALJ's failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case. Moran, 569 F.3d at 114-15.

In this case, the ALJ was aware that the record contained no reports from Plaintiff's current treating physician, Dr. Osipov, whom Plaintiff testified she had seen twice prior to the hearing. (R. 59).  The ALJ also observed that there was no documentation of Plaintiff's visits to the emergency room after the accident.  (R. 15).  Furthermore, the only document from Plaintiff's prior treating physician, Dr. Zabarsky, was the December 16, 2009, physical therapy prescription.  (R. 297).  At a minimum the record indicates that the SSA considered a "report of 07/09/09" from Dr. Zabarsky in assessing Plaintiff's claims (R. 70, 71) – but that report appears nowhere in the record and is unmentioned by the ALJ.

17

As noted, the ALJ asked counsel to "see if there's anything else out there we don't have" and left the record open for two weeks. (R. 60). Counsel responded by letter that Dr. Zabarsky had retired and taken his records with him. (R. 207). She offered no comment as to reports or tests from Dr. Osipov, although an MRI and report from Dr. Osipov were later submitted to the Appeals Council.[5] There is no indication that ALJ Lahat pursued any of these areas further. That the ALJ requested information from Plaintiff's attorney regarding two treating physicians and received nothing "does not relieve the ALJ of his duty to fully develop the record." Newsome, 817 F. Supp. 2d at 137. Failure to develop the record as to Plaintiff's treating physicians is particularly salient because the ALJ ultimately accorded non-treating physician Dr. Caiati's opinion "significant weight" as to Plaintiff's RFC. (R. 17). See Harris, 2013 WL 5278718, at *8 ("[The ALJ's] duty must include seeking out additional documentation before discounting the treating physician's opinion, even where counsel has previously promised (but failed) to provide the documents.").

Where, as here, "there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order." Sobolewski v. Apfel, 985 F. Supp. 300, 314 (E.D.N.Y. 1997). Accordingly, the Court finds that a remand in this case – requiring further findings from treating physicians Dr. Zabarsky (at least the report considered by the SSA) and Dr. Osipov, as well as documentation of Plaintiff's emergency room visits – is necessary to assure the proper disposition of Plaintiff's claim.

---

[5] The Commissioner's contention that Dr. Osipov's medical source statement should not be considered in this case because it is "dated after the ALJ's decision and does not relate back to the relevant period," (Mem. at 22), is without merit. Even if Dr. Osipov's report is not a retrospective assessment, "evidence of plaintiff's condition at a later time [is] relevant to the extent that it shed[s] light on plaintiff's condition as of the date she was last insured." Moscatiello v. Apfel, 129 F. Supp. 2d 481, 489 (E.D.N.Y. 2001).

## IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied and this case is remanded for further proceedings in accordance with this opinion.

**SO ORDERED.**

/s/
SANDRA L. TOWNES
United States District Judge

Dated: September 30, 2013
Brooklyn, New York